**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JAMES KILLIS,

      Plaintiff,

      v.

MEDIEVAL KNIGHTS, LLC,

      Defendant.

No. 04 C 6297
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

James Killis, Jr. ("Mr. Killis" or "Plaintiff) filed a two-count complaint against Medieval
Knights, LLC ("Medieval Knights" or "Defendant").  In Count I, Mr. Killis seeks to recover for
retaliatory discharge.  In Count II, he alleges that Medieval Knights failed to provide him with
timely notice of his rights to insurance continuation.  Currently before me is Medieval Knights'
Motion for Summary Judgment or, in the alternative, Partial Summary Judgment.  For the
reasons that follow, that motion is granted in part and denied in part.

## I.    BACKGROUND

In 1994**,** Medieval Knights hired Mr. Killis to participate in its Chicago-area Medieval
Times dinner and show at the Schaumburg Castle.  Plaintiff worked as a squire from 1994 to
1996.  He was promoted from squire to knight in late 1998 or early 1999, and continued to work
as a knight until June 2004.  Mr. Killis's responsibilities as a knight included demanding physical
activity.  He engaged in choreographed, simulated combat and wore heavy metal armor.  During
the performance, knights swing heavy weapons and perform some sequences on horseback.

Between May 1999 and January 2002, Plaintiff filed three workers' compensation claims
for amounts other than merely expenses.  In April 2003, some knights met with an attorney at a

restaurant called the Fox & Hound to discuss their workers' compensation rights. Subsequently, on April 10, 2003, Eric Chiusolo, the Senior Vice President and Secretary/Treasurer of Medieval Knights, issued a memorandum to knights and squires discouraging the filing of false workers' compensation claims. Although the memo was ostensibly aimed at combating insurance fraud among knights, Mr. Chiusolo later testified that he was not aware of any such problem existing in the company. Moreover, he further acknowledged that one of reasons he issued the memorandum was to reduce claims.

Starting in September 2003, Mr. Killis began receiving negative performance evaluations. He received negative evaluations in September 2003, January 2004, and April 2004. In November 2003, Mr. Killis filed a fourth workers' compensation claim for a left shoulder separation. On March 16, 2004, Mr. Killis was given a final warning that his performance was not acceptable. Medieval Knights removed Plaintiff from performing in the show in March 2004. In June 2004, Mr. Killis rejected a $5,000 settlement offer from the workers' compensation carrier. The carrier then offered a $10,000 settlement, which Mr. Killis also rejected. Medieval Knights terminated Killis's employment about a week and a half later, on June 18, 2004. Medieval Knights told Killis that his termination resulted from unsatisfactory and unimproved job performance.

## II.   DISCUSSION

### A.   *Summary Judgment Standard*

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.

R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-33 (1986) (stating that summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). If the moving party meets this burden, the nonmoving party must then go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e). A genuine issue of material fact exists when there is evidence on the basis of which a reasonable jury could find in the plaintiff's favor, allowing for all reasonable inferences drawn in a light most favorable to the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The non-moving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (*citing Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

### B.    *Failure to Provide Notice Under COBRA*

Killis contends that he did not receive notice of his insurance continuation rights under the Comprehensive Omnibus Budget Reconciliation Act ("COBRA").

COBRA requires that employers allow former employees the opportunity to continue health care coverage under the employer's plan (at their own expense, not to exceed 102 percent of the employer's cost) if a qualifying event occurs. 29 U.S.C. § 1161. When a qualifying event occurs (such as termination of employment, *see* 29 U.S.C. § 1163(2)), the employer is required to notify the plan administrator within thirty days of the date of the qualifying event. 29 U.S.C. § 1166(a)(2). Once the plan administrator is notified, the administrator must notify the employee of his continuation rights within fourteen days. 29 U.S.C. §1166(c) (2007). In this case, Mr.

Killis's termination serves as a qualifying event under 29 U.S.C. §1163.  The question, therefore, is whether the required notice was properly provided within the statutory period.

Plaintiff maintains that he did not receive the proper notice; nevertheless, Defendant may be deemed to have complied with the statute if it acted in "good faith."  *See Keegan v. Bloomingdale's*, 992 F.Supp. 974, 977 (N.D. Ill. 1998) ("[A] good faith attempt to comply with a reasonable interpretation of the statute is sufficient to satisfy COBRA requirements.").  The plan administrator must have "caused the notice to be sent in a good faith manner reasonably calculated" to reach the employee.  Proof of actual receipt is not necessary.  *Id.*  Notice by first class mail addressed to the former employee's last known address is an acceptable method of notification.  *Id.* at 979.  Therefore, Killis must demonstrate not only that he did not receive actual service, but also that the notice was not provided in a manner reasonably calculated to reach him.

Here, the plan administrator sent the notice to an address that Mr. Killis had previously provided.  In his response, Plaintiff claims that he had informed his employer of his change of address prior to his termination, and therefore, that notice was sent to an address other than his "last known address."  However, in his deposition, Mr. Killis concedes two critical points: first, that Medieval Knights did in fact send notice to his "last known address;" second, that he was receiving mail at this address, including his last paycheck, at the time of the notification.  Thus, Plaintiff destroys his own claim that notice was sent to an improper address.

There remains some question as to whether notice was sent within the statutory period.  There are two constituent parts to the statutory notice requirement.  First, the employer must notify the plan administrator within thirty days of the adverse employment action.  29 U.S.C.

4

§1166(a)(2).  Second, the plan administrator must provide notice to the affected employee within fourteen days.  29 U.S.C. §1166(c).  Mr. Killis concedes, in his response to Medieval Knights' motion, that the plan administrator provided notice to him within fourteen days of its receipt of notice that he had been terminated.  He contends, however, that Medieval Knights failed to notify the plan administrator within thirty days of terminating him, and therefore, that he did not receive notice within the forty-four days the statute contemplates.

If notice was sent after this period expired, then Medieval Knights violated Killis's COBRA rights.  *See Van Hoove v. Mid-America Bldg. Maint., Inc.*, 841 F.Supp. 1523, 1535 (D.Kan. 1993).  As noted above, Mr. Killis was terminated on June 18, 2004.  He claims that Medieval Knights notified its plan administrator on July 23, 2004, exceeding the thirty-day statutory period set forth in § 1166(a)(2).  Additionally, he asserts that the notification was sent no sooner than August 5, 2004, forty-eight days after his termination.  Medieval Knights fails to rebut this allegation**,** instead resting on its assertion that Mr. Killis may not advance this theory for the first time in response to a motion for summary judgment.

Medieval Knights claims that because Mr. Killis did not specifically note the lateness of the mailing in his complaint, it is not properly before me in deciding this motion for summary judgment.  Defendant is correct that Plaintiff did not raise this theory in either the original or the amended complaint.  However, as a matter of law, this omission does not preclude the claim.  A pleading need only provide a short, plain statement of the grievance that provides defendants with sufficient notice.  *Pierce v. Illinois Dep't of Human Serv.,* 128 Fed. Appx. 534, 536 (7th Cir. 2005).  In this context, such notice requires merely "the claims and the grounds they rest upon, along with 'some indication . . . of time and place.'"  *Id.* (*quoting Thomson v. Washington,* 362

F.3d 969, 970-71 (7th Cir. 2004)). This liberal pleading standard does not imply that a plaintiff may raise wholly new claims at the summary judgment stage. *See Gilmour v. Gates, McDonald and Co.,* 382 F.3d 1312, 1314 (11th Cir. 2004). Rather, the appropriate method of introducing a new claim is to amend the complaint according to Federal Rule of Civil Procedure 15(a). *See Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir. 1996).

Although I would not consider a wholly new claim introduced in response to Defendant's motion for summary judgment, the allegedly new claim here is not so new as to warrant either an amended complaint or a discounting of Plaintiff's argument with respect to the date of the mailing. Mr. Killis's pleading, which cited "29 U.S.C. §1161 *et seq.*," provided Medieval Knights with sufficient notice as to the relevant statute and a brief statement of the violation. Thus, the adjustment in Mr. Killis's claim—from arguing that notice was non-existent to arguing that it was late—is appropriate for consideration on the motion for summary judgment.

A genuine dispute as to a material fact sufficient to defeat a motion for summary judgment may arise if the defendant is unable to show that a COBRA mailing was sent within the statutorily required time period. *See Burchett v. United States Postal Serv.*, No. 03 C 1325, 2006 WL 2794807 (N.D. Ill. September 26, 2006); *see also Lawrence v. Jackson Mack Sales, Inc.*, 837 F. Supp. 771, 783-84 (S.D. Miss. 1992) (denying summary judgment to defendant where it failed to show that it had properly addressed and mailed COBRA notices).

Because there remains a dispute as to a material fact—whether Medieval Knights complied with its requirements under 29 U.S.C. § 1166(a)(2) to provide timely notice to the plan administrator that it had terminated Mr. Killis's employment—summary judgment in favor of the

defendants on this count is inappropriate.  Defendant's motion for summary judgment on the charge that it failed to provide adequate notification under COBRA is denied.

### C.     *Retaliatory Discharge*

Mr. Killis also claims that Medieval Knights terminated him in retaliation for his filing workers' compensation claims.  Illinois law provides that a valid claim for retaliatory discharge requires that the plaintiff show that "(1) an employee has been discharged; (2) in retaliation for the employee's activities; and (3) that the discharge violates a clear mandate of public policy." *Carter v. Tennant Co.,* 383 F.3d 673, 677 (7th Cir. 2004) (*quoting Bourbon v. Kmart Corp.,* 223 F.3d 469, 472 (7th Cir. 2000)).  Because this is a workers' compensation case, Mr. Killis must show (1) that he was the defendant's employee before his injury; (2) that he exercised a right granted by the Workers' Compensation Act; (3) and that he was discharged from his employment with a causal connection to his filing a workers' compensation claim."  *Hiatt v. Rockwell Int'l Corp.,* 26 F.3d 761, 767 (7th Cir. 1994).  The element of causation cannot be met if the employer "has a valid basis, which is not pretextual, for discharging the employee."  *Carter* (*quoting Darnell v. Impact Indus., Inc.,* 473 N.E.2d 935, 937 (Ill. 1984)).

An outstanding question remains concerning whether a federal court exercising diversity jurisdiction over a retaliatory discharge claim should use the above-cited Illinois framework, or whether it may use the familiar burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The Illinois Supreme Court has expressly rejected the use of the *McDonnell Douglas* framework when assessing Illinois retaliatory discharge cases.  *See Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 407-08 (Ill. 1998).  The Seventh Circuit explains that the Illinois Supreme Court "was concerned that use of the *McDonnell Douglas* framework 'would, in

essence, expand the tort of retaliatory discharge by' . . . reliev[ing] plaintiffs of their burden to prove as an element of their *prima facie* case under Illinois law a causal link between their workers' compensation claims and their discharge." *Carter*, 383 F.3d at 677-78 (*quoting Clemons*, 704 N.E.2d at 408). However, the Seventh Circuit reiterated recently that the question of which framework to employ becomes immaterial when the defendant is able to provide a valid, non-pretextual reason for terminating the employee. *See McCoy v. Maytag Corporation*, 495 F.3d 515, 522 (7th Cir. 2007). I conclude that Medieval Knights has provided such a reason here, thus I decline to address the question of which framework should be used.

Even assuming that Mr. Killis could establish a *prima facie* case of retaliatory discharge (under either framework), his claim fails because Defendant sets forth a legitimate, nondiscriminatory reason for firing him, and Mr. Killis is unable to demonstrate that this reason is pretext. Medieval Knights posits that it terminated Mr. Killis because he was performing poorly in his job. Defendant points to negative performance reviews that Mr. Killis received in September 2003, January 2004, and April 2004. Furthermore, Defendant points to a final warning that Mr. Killis was given in March 2004 concerning his poor performance. Without question, these negative performance evaluations are sufficient to satisfy Defendant's burden of offering a legitimate, non-discriminatory reason for its action. *See Helland v. South Bend Community School Corp.*, 93 F.3d 327, 330 (7th Cir. 1996) (indicating that negative evaluations constitute "legitimate non-discriminatory reasons"). The issue, then, becomes whether Mr. Killis can demonstrate that these reasons were mere pretext.

Mr. Killis fails to demonstrate that Defendant's proffered reasons for terminating him are mere pretext. In order to demonstrate that an employer's reasons for adverse employment action

are pretextual, Killis must put forth evidence showing (1) that the proferred reasons have no basis in fact, (2) that the proffered reasons did not actually motivate the termination, or (3) that they were insufficient to motivate the discharge. *Velasco v. Illinois Dep't of Human Serv.,* 246 F.3d 1010, 1017 (7th Cir. 2001).

While he ultimately fails to establish pretext, Mr. Killis sets off in a promising fashion by successfully establishing Defendant's focus on reducing workers' compensation claims. The deposition testimony of Eric Chiusolo demonstrates that Defendant was motivated by a desire to reduce workers' compensation claims. First, Chiusolo testifies that he distributed a memorandum warning against the filing of fraudulent workers' compensation claims even though he was unaware of any such problems within the organization. This, coupled with the fact that the memorandum was distributed shortly after some of Defendant's employees met with an attorney regarding their workers' compensation rights, supports the inference that Defendant sought to reduce workers' compensation claims. In addition, Chiusolo even testified that one of the motivating factors for distributing the memo was to help reduce claims. Taken together, all of this buttresses the first part of Mr. Killis's thesis, which is that Defendant was focused on reducing the number of workers' compensation claims filed by its employees.

Simply establishing Defendant's motivation to reduce workers' compensation claims, though, is not enough to satisfy Plaintiff's burden of demonstrating pretext. Workers' compensation claims constitute costs for Defendant. Like any for-profit enterprise, Defendant is motivated by a desire to keep its costs low. Thus, without more, Defendant's desire to reduce claims alone is not enough to establish pretext. *Cf. Hiatt v. Rockwell Int'l Corp.,* 26 F.3d 761, 768-69 (7th Cir. 1994) (holding that a supervisor's animosity toward an employee's workers'

compensation claims does not necessarily constitute proof that the animosity played a causal role in the adverse employment action).

Mr. Killis says that before April 2003, he had filed three workers' compensation claims that sought amounts other than just expenses. In that time period, he had received no negative performance evaluations of any kind. Then, in April 2003, Defendant responded to the employees' meeting with the lawyer by distributing the above-referenced memorandum. Then—on November 11, 2003, after the "crackdown"—Mr. Killis filed yet another workers' compensation claim. "Around the time" that he filed this fourth claim (the first post-"crackdown"), Mr. Killis began receiving negative performance evaluations. Some months after the commencement of these negative evaluations, Mr. Killis was removed from performing in the show. Thereafter, he was terminated.

This narrative could have been quite compelling for Mr. Killis. What destroys the narrative, however, is the fact that the first negative evaluation *preceded* his post-"crackdown" workers' compensation claim. That is, Mr. Killis received his first negative performance evaluation in early September 2003—more than two months *before* November 11, 2003, when he filed his post-"crackdown" workers' compensation claim.

Had his 2003 workers' compensation claim been filed before the onset of the negative evaluations, he would have had a powerful line to take with a jury. He could have claimed that as part of its effort to discourage the filing of workers' compensation claims, Defendant decided to make an example of Mr. Killis and terminate him for filing his post-"crackdown" claim. He could have further argued that the negative evaluations were simply the handiwork of a

sophisticated entity seeking to cover its tracks for firing Mr. Killis.[1] The fact that the negative evaluations commenced before the filing of his claim, however, decimates this narrative. It completely undermines the notion that the negative evaluations were concocted to cover up the true reason for firing Mr. Killis. On the contrary, the timing of the first negative evaluation lends credibility to the veracity of that evaluation and to the good-faith nature of the other evaluations he received. Ultimately, the timing of the first negative evaluation dooms Plaintiff's ability to establish that Defendant's proffered reason for terminating him was pretextual.[2]

The fact that Defendant promoted other individuals who filed post-"crackdown" workers' compensation claims also undermines Plaintiff's theory. Defendant points to Stephen Ager, who filed a claim on May 28, 2004, and Michael Shepard, who filed a claim on March 6, 2004.

---

[1]This story would not necessarily have assured Mr. Killis of victory at trial. Defendant would have had the opportunity to convince the jury that its negative evaluations of Mr. Killis were made earnestly and in good faith. Defendant could have further argued that it terminated Mr. Killis solely as a result of his diminished performance as a knight. However, had the negative evaluations not begun until after Mr. Killis filed his post-"crackdown" claim, it likely would have been enough for him to withstand this motion for summary judgment.

[2]Mr. Killis also attempts to establish pretext by attacking the authenticity of these evaluations. That is, he implies that they were *ex post* fabrications designed to justify Mr. Killis's termination. This is, quite obviously, a very serious charge. It is also one that, if true, would have a significant impact on these proceedings. However, Mr. Killis presents no evidence to support this theory. This is insufficient to defeat Defendant's motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (holding that Rule 56 "provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact"); *see also Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (holding that evidence must not be based on "flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that knowledge.").

Neither of these individuals were terminated, and in fact, both were promoted.[3] It is not certain that these individuals' situations would have been fatal to Mr. Killis's efforts to defeat summary judgment if the adverse employment actions had commenced after he filed his post-"crackdown" claim. What is clear, however, is that the situation being what it is, the fact that Messrs. Shepard and Ager were promoted further undermines the notion that Mr. Killis was terminated for filing workers' compensation claims.

In sum, the negative performance evaluations that Mr. Killis received constitute a legitimate, nondiscriminatory explanation for his termination. Because he fails to establish that this reason was pretextual, summary judgment is proper on his claim.

## III.    <u>CONCLUSION</u>

There is a genuine issue of material fact as to whether Medieval Knights mailed COBRA notice within the statutory period. However, Mr. Killis fails to establish a basis upon which a reasonable juror could conclude that he was terminated in retaliation for filing workers' compensation claims. Therefore, Defendant's motion for summary judgment is DENIED as to Mr. Killis's COBRA claim, but is GRANTED as to his retaliatory discharge claim.

ENTER:

_James B. Zagel_

James B. Zagel
United States District Judge

DATE:  December 4, 2007

---

[3]Defendant also points to Philip Newcomb, but it appears that the last claim Mr. Newcomb filed was in February 2003, before the "crackdown." Accordingly, Mr. Newcomb's situation is not probative of whether Defendant sought to chill the filing of claims after April 2003.